# EXHIBIT A

# THE STATE OF NEW HAMPSHIRE
## JUDICIAL BRANCH
### SUPERIOR COURT

Grafton Superior Court
3785 D.C. Highway
North Haverhill NH  03774

Telephone: 1-855-212-1234
TTY/TDD Relay: (800) 735-2964
http://www.courts.state.nh.us

## SUMMONS IN A CIVIL ACTION

Case Name:     **Fujifilm Dimatix Inc v Stantec Consulting Services, Inc.**
Case Number:   **215-2015-CV-00188**

Date Complaint Filed: July 16, 2015

A Complaint has been filed against Stantec Consulting Services, Inc. in this Court. A copy of the Complaint is attached.

### The Court ORDERS that ON OR BEFORE:

| | |
|---|---|
| September 04, 2015 | Fujifilm Dimatix Inc shall have this Summons and the attached Complaint served upon Stantec Consulting Services, Inc. by in hand or by leaving a copy at his/her abode, or by such other service as is allowed by law. |
| September 25, 2015 | Fujifilm Dimatix Inc shall file the return(s) of service with this Court. Failure to do so may result in this action being dismissed without further notice. |
| 30 days after Defendant is served | Stantec Consulting Services, Inc. must file an Appearance and Answer or other responsive pleading form with this Court.  A copy of the Appearance and Answer or other responsive pleading must be sent to the party listed below and any other party who has filed an Appearance in this matter. |

**Notice to Stantec Consulting Services, Inc.:** If you do not comply with these requirements you will be considered in default and the Court may issue orders that affect you without your input.

Send copies to:
   Thomas J. Pappas, ESQ

Primmer Piper Eggleston & Cramer
PO Box 3600
Manchester NH  03105

BY ORDER OF THE COURT

July 21, 2015

David P. Carlson
Clerk of Court

(468)

THE STATE OF NEW HAMPSHIRE

GRAFTON, SS.                                                                 SUPERIOR COURT

Docket No.:

FUJIFILM DIMATIX, INC.
109 Etna Road
Lebanon, NH 03766

v.

STANTEC CONSULTING SERVICES, INC.
5 Dartmouth Drive, # 101
Auburn, NH 03032
(Registered Agent: Lawyers Incorporating Service, 14 Centre Street, Concord, NH 03301)

## COMPLAINT

Plaintiff FUJIFILM Dimatix, Inc. ("FDMX"), by its attorneys, Primmer Piper Eggleston & Cramer PC, complains against defendant as follows:

## PARTIES

1. Plaintiff FDMX is a Delaware corporation with offices and manufacturing facilities located in Lebanon, New Hampshire.

2. On information and belief, defendant Stantec Consulting Services, Inc. ("Stantec") is a New York corporation with offices in Auburn, New Hampshire and Rochester, New York.

## JURISDICTION AND VENUE

3. The Court has jurisdiction over this matter pursuant to NH RSA 491:7.

4. Venue is proper in this County because Plaintiff FDMX has offices and manufacturing facilities located in Grafton County, and the facts and circumstances giving rise to this matter occurred in Grafton County.

1

## FACTUAL ALLEGATIONS

5.  FDMX is a leading developer and manufacturer of state-of-the-art inkjet printheads, components and assemblies used in industrial inkjet printers. FDMX's products are used in diverse markets worldwide, including graphics, electronics, flat-panel displays, life sciences, chemistry, 3-D mechanics, optics and photovoltaics.

6.  FDMX's precision inkjet printheads are designed to jet various fluids through channels that are extremely small (20 micrometers or less, with a micrometer equaling one millionth of a meter). During manufacture, airborne particles or other contaminants as small as 5 micrometers can clog or disrupt these minute channels, ultimately causing a failure of the entire printhead. The epoxy that is sprayed onto the printhead components during manufacture to bond components together is also extremely susceptible to airborne contamination. Airborne particles can adhere to the epoxy and become bonded to the printhead, causing cracks or bonding failures in the fragile ceramic piezoelectric material that is contained in the printhead and which is critical to accurate and repeatable printhead performance.

7.  For these reasons, the manufacture and assembly of FDMX's precision inkjet printheads must be carried out in a clean-room manufacturing environment – that is, an environment that is carefully controlled with respect to the size and concentration of airborne particles and contaminates – including dust, airborne microbes, aerosol particles and chemical vapors – as well as with respect to temperature, humidity and air pressure.

8.  In or about 2001, FDMX leased an industrial property located at 101 Etna Road in Lebanon, New Hampshire and engaged St. John Engineers, P.C., a mechanical engineering firm owned by Eric St. John, P.E. ("St. John") and specializing in clean-room design, to provide professional services for the installation of clean rooms at the property. Specifically, St. John

designed and supervised the construction of two clean-room modules (modules 1 and 2) which, upon completion, afforded FDMX a production capacity of 2-3,000 printheads per month.

9. As a result of this engagement, St. John became intimately familiar with FDMX' manufacturing processes and requirements. Subsequent to this engagement, and prior to the project at issue herein, St. John joined Stantec as a principal and engineering manager.

10. In or about 2004, facing increased demand for its printheads, FDMX leased the adjacent building at 109 Etna Road in order to expand its production capabilities. At this time, St. John Engineers, P.C. had ceased operations and FDMX engaged another local engineering firm, Bonhag Associates, to upgrade the existing clean rooms at 101 Etna Road and to remodel and expand the building at 109 Etna Road to accommodate two additional clean rooms (modules 3 and 4). Upon their completion, FDMX's expanded facilities at 101 and 109 Etna Road (referred to collectively herein as the "Facilities") gave it a production capacity of 13-14,000 printheads per month.

The 25K Reconfiguration Project

11. In or about April 2012, FDMX engaged Stantec to conduct a schematic design investigation to determine the feasibility of, and the recommended means for, further expanding and upgrading the Facilities to accommodate a monthly production of 25,000 printheads.

12. In accepting this new engagement, Stantec agreed to provide a dedicated team of design and engineering professionals, including St. John, Roger Kelemecz ("Kelemecz"), a licensed architect, Brian Larson, P.E., William Pulse, Senior Mechanical Engineer, and Mark Kotar, Senior Electrical Designer.

13. Between April and November 2012, Stantec performed this schematic design investigation and, in a Design Investigation Report dated November 6, 2012, advised FDMX that

3

the Facilities had sufficient square footage to accommodate a monthly production of 25,000 printheads, provided that FDMX performed further renovations, including the replacement of obsolete manufacturing areas and the relocation and reconfiguration of certain production processes, to achieve this increased production (the "Project"). Stantec also estimated that the Project would cost approximately $4 million.

14. On or about November 8, 2012, Stantec issued a Detailed Design Proposal for the Project setting forth, among other things, the scope of Stantec's proposed architectural, engineering and construction administration services, proposed design deliverables, project schedule and Stantec's proposed not-to-exceed fee of $500,000 (on an applied time plus reimbursable cost basis).

15. In or about November 2012, FDMX determined to proceed with the Project and engaged Stantec to provide architectural, engineering and construction administration services for the Project.

16. As its centerpiece, the Project called for the construction of a new core clean room, designed in an open-suite or "ballroom" configuration in order to maximize FDMX's operational flexibility and to accommodate future layout changes and production needs.

17. Stantec also agreed to design the new and renovated clean rooms to meet performance criteria specified by FDMX and based upon clean room standards promulgated by the International Standards Organization (ISO). The ISO standards specify, among other things, the maximum permitted concentrations of airborne particles of a given size per cubic meter of air, and the minimum required number of air changes per hour – *i.e.*, the air-exchange rate or "ACH," which refers to the number of times per hour that filtered outside air replaces the existing volume in the room. The ISO standards also delineate three clean-room states or

4

conditions in which to measure the performance of the room: (i) "as-built" (*i.e.,* immediately following construction); (ii) "at-rest" (*i.e.,* with instruments and equipment installed); and "operational" (*i.e.,* with personnel added and engaged in production). Stantec agreed to design each of the new and renovated clean rooms to meet its specified ISO Class designation in the *operational* state.

18. In particular, Stantec agreed to design the core clean room to meet ISO Standard 14644-1 and ISO Class 6 Operational (which approximates a "Class 1,000" clean room under the federal classification standards previously issued by the U.S. General Services Administration).

19. In addition, Stantec agreed to design ancillary clean rooms meeting ISO Standard 14644-1 and specified classifications, including: (i) a washroom (used for washing and drying parts and raw materials) meeting ISO Class 7 Operational (or federal Class 10,000); (ii) a white room (used for additional parts processing) meeting ISO Class 8 Operational (or federal Class 100,000); and (iii) a gowning room (used for donning clean-room attire) meeting ISO Class 7 Operational (or federal Class 10,000).

20. During the design phase of the Project, FDMX also made clear to Stantec that the ISO standards specified by FDMX were *minimum* criteria only and that in practice FDMX operates and maintains its clean rooms at performance levels at least one class higher than their nominal designations. FDMX also provided Stantec with records of FDMX's historical, operational clean room performance demonstrating FDMX's more stringent operating criteria and practices. FDMX advised Stantec that it required similarly enhanced clean-room performance in the Project's new and expanded clean rooms, which Stantec acknowledged and agreed.

5

21. During the design phase, FDMX also advised Stantec that FDMX required redundant capabilities in the clean room operating systems, including in the air-handling and dehumidification units, in order to deal with and allow for planned equipment shut-downs as well as unplanned equipment failures, which Stantec acknowledged and agreed.

22. At FDMX's insistence, the Project was also planned to be carried out in stages to allow for continuous printhead production during the work, and Stantec acknowledged in its Design Investigation Report that the Project "has been organized and phased to allow for continued production operation during the renovation."

The Contract

23. On or about December 5, 2012, FDMX and Stantec executed a contract (based on form AIA Document B152 – 2007) pursuant to which Stantec agreed to provide architectural, engineering and construction administration services for the Project (the "Contract").

24. Under the Contract, Stantec agreed to prepare architectural and engineering schematic designs for the Project, as set forth in Sections 3.4 through 3.7 and as more particularly described in Contract Attachment B (incorporating Stantec's November 8, 2012 Design Development Proposal) and in Attachment C (incorporating portions of Stantec's November 6, 2012 Design Investigation Report).

25. Under Contract Section 3.8 (Contract Documents Phase), Stantec agreed to prepare formal working drawings for the Project, including plans, specifications and bidding documents (the "Contract Documents"). In addition, Contract Attachment A, Section C states: "It shall be Architect's sole responsibility to prepare the Construction Documents with sufficient specifications, details, sections, elevations [and] architectural information as may be necessary

6

for accurate pricing, plan review by governing authorities and for the construction of the Project."

26.     Under Contract Section 3.10 (Construction Phase Services) and under AIA Document A201 – 2007, General Conditions of the Contract for Construction (the "General Conditions") incorporated by reference in the Contract, Stantec agreed, among other things: (i) to advise and consult with FDMX during the construction phase; (ii) to review all shop drawings and submittals prepared by the contractors on the Project; (iii) "to visit the site at intervals appropriate to the stage of construction . . . and to determine, in general, if the Work is being performed . . . in accordance with the Contract Documents"; and (iv) to "keep [FDMX] reasonably informed about the progress and quality of the portion of the Work completed, and report to [FDMX] (1) known deviations from the Contract Documents and . . . (2) defects and deficiencies observed in the Work." Contract, §§ 3.10.1.1 – 3.10.2.2; *see also* General Conditions, §§ 4.2.1 – 4.2.14.

27.     The two largest components of Stantec's fee for the Project were for preparing the Contract Documents for construction and for Construction Phase Services, which together comprised nearly 60% of Stantec's fee.

28.     Contract Attachment A, Section G provides: "If the Architect becomes aware of any defect in the work, or becomes aware of any work that is not performed in accordance with the Construction Documents, the Architect shall provide prompt written notification to the Owner and the Contractor."

29.     Under Contract Section 3.10.3.1, Stantec agreed to review and certify progress payments due the general contractor, which certifications constituted a representation by Stantec that the quality of the work was in accordance with the Contract Documents.

30. Under the General Conditions, Stantec agreed to serve as "Owner's representative during construction until the date the Architect issues the final Certificate for Payment" and to "conduct inspections to determine the date or dates of Substantial Completion and the date of final completion [and to] issue Certificates of Substantial Completion . . . ." *Id.*, §§ 4.2.1 and 4.2.9.

31. General Conditions Section 9.8.1 defines "Substantial Completion" as the stage in the progress of the Work when the Work or designated portion thereof is sufficiently complete in accordance with the Contract Documents . . . so that the Owner can occupy or utilize the Work for its intended use."

32. Under Section 2.0 of Contract Attachment B ("A/E Scope of Services"), Stantec also agreed, among other things, to provide "Final Punch List Review and Project Closeout," which is the concluding project phase when all construction activity is completed and the Project is systematically transitioned to the Owner.

33. Under Section 2.2 of the Contract, Stantec agreed to perform all of the foregoing services with "professional skill and care" and "as expeditiously as is consistent with such professional skill and care and the orderly progress of the Project."

34. Under Section 12.1 of the Contract, Stantec agreed to indemnify FDMX, its parent and affiliates from and against, *inter alia*, "all losses, claims, liabilities, injuries, damages and expenses, including reasonable attorneys' fees" arising out of or resulting from Stantec's "negligent errors, omissions or negligent acts . . . and any breach by [Stantec] of any term of this Agreement."

8

### The Build Contract

35.  Pursuant to an agreement dated May 13, 2013, FDMX engaged Engelberth Construction, Inc. ("Engelberth") to act as general contractor and to build the Project for a guaranteed maximum price to be determined by the parties, based on the sum of Engelberth's estimate of the cost of the Project plus its fee.

36.  In or about August 2013, FDMX and Engelberth agreed that the Project would be built for a guaranteed maximum price of $5,921,702.

### The Construction of the Project

37.  Work on the Project commenced in or about May 2013 and was scheduled to be completed in or about June 2014. The work was also planned and carried out in phases as follows:

- Phase 1   (bathrooms, break room, conference room)
- Phase 2   (assembly, testing, materials, packaging and S/R room)
- Phase 3B (white room and gowning room)
- Phase 3C (north clean room)
- Phase 3D (clean room and wash room)

38.  Between September 2013 and March 2014, as work on each of the foregoing phases neared completion, Stantec inspected the work and performed a punchlist of the outstanding items, attesting to the completeness of the work in accordance with the Contract Documents and the readiness and suitability of each phase for occupancy by FDMX.

39.  Between November 2013 and March 2014, as each of the clean rooms neared completion, the mechanical contractor, Palmer & Sicard, performed testing, adjusting and balancing (TAB) of the mechanical systems in accordance with the requirements of the Contract

Documents. During this same period, upon the completion of TAB for each clean room, Engelberth sent to Stantec for its review and approval a report setting forth the results of these testing and balancing efforts, and Stantec approved each of these reports without comment (with the exception of a minor comment on Phase 3D not relevant here), thereby confirming and representing to FDMX that the mechanical systems were properly installed, operational and performing satisfactorily.

40. As each clean room was completed, FDMX engaged a third-party certification company, B & V Testing, Inc. ("B & V"), to confirm that the room met its required ISO performance classification and criteria. At that time, B & V indicated that the rooms met their ISO classifications, and FDMX occupied each clean room when ready and resumed production activities, as FDMX and Stantec had contemplated from the outset of the Project.

41. Between September 2013 and March 2014, Engelberth issued, and Stantec reviewed and approved, Certificates of Substantial Completion for each phase of the Project, confirming, to Stantec's "best knowledge, information and belief," that the work had been reviewed by Stantec and found to be substantially and "sufficiently complete in accordance with the Contract Documents so that the Owner can occupy or utilize the Work for its intended use."

Stantec's Errors, Omissions and Contract Breaches

42. Notwithstanding Stantec's agreement to staff the Project with a dedicated team of senior design professionals, including St. John and Kelemecz, Stantec instead utilized and assigned junior staff with little experience in clean-room design and construction.

43. In April 2014, as the Project neared final completion, FDMX discovered that, as a result of errors and omissions by Stantec in the design and execution of the Project, *none* of the clean rooms operated properly or met the ISO classifications specified by FDMX, including with

respect to particle counts and air exchange rates. These errors and omissions by Stantec included, among other things:

(a) As early as January and February 2014, low outside air temperatures repeatedly tripped the freezstats in the air handling units specified by Stantec (as a result of low temperatures at the cooling coils), causing the units to shut down. This was the result of errors in Stantec's design, and was rectified only after considerable time and added expense by FDMX, in consultation with its mechanical contractor, including through the installation of a gas-fired duct furnace in the outside air intake duct;

(b) Between March and May 2014, testing of the as-built as well as the operational condition of the gowning room revealed particle concentrations greater than the maximum allowable for ISO Class 7 certification. These defects necessitated reengineering and redesign by FDMX, including the addition of additional HEPA filters and air-flow returns, in order to achieve the required ISO classification.

(c) In May 2014, testing of the core clean room under operational conditions revealed that it failed to meet the minimum required ISO Class 6 performance criteria, including with respect to particle counts and air exchange rates, and did not meet FDMX's operating criteria and practices of at least one class higher. These defects were corrected only after considerable time, expense and remedial measures by FDMX, including the design and installation of 11 clean-room "micro-environments" – *i.e.*, separately partitioned, enclosed and self-contained work areas and workstations inside the core clean room with their own HEPA filters. While installation of micro-environments resulted in improved air quality, this also

11

defeated the open-suite design concept and operational and production flexibility that were key Project goals.

(d) During the design review phase of the Project, Stantec confirmed that the existing chilled water pumps and hot water pumps were adequate for the Facilities' expanded operations. In April 2014, however, when FDMX started up the new chiller at the Facilities, it discovered that the capacity of the existing hot water and chilled water pumps was inadequate, requiring the replacement of the existing pumps and the installation of additional pumps.

(e) During the design phase of the Project, FDMX made clear to Stantec that the clean-room environments must be maintained at all times and that FDMX required redundant capabilities in the clean room operating systems, including in the air-handling and dehumidification units, in order to address planned equipment shut-downs as well as unplanned equipment failures. In June 2014, the first of several mechanical failures occurred in the dehumidification unit specified by Stantec, causing the clean rooms to lose humidity control. To avoid these critical shutdowns of the clean rooms, and to obtain the necessary redundancy, FDMX was required to install a redundant dehumidification system.

(f) As a result of the numerous deficiencies discovered by FDMX, and the corrective actions described above, FDMX was required to rebalance the core clean room's mechanical systems to the maximum air flow available, resulting in further costs and delays to achieve the minimum contracted-for performance.

(g) In addition, as a result of the numerous deficiencies discovered by FDMX, and the corrective actions described above, the Project's construction schedule was

extended by six months, causing FDMX to incur added expense for Project supervision, management and administration.

44. In the spring of 2014, as FDMX discovered and alerted Stantec to the deficiencies in the clean rooms' design and performance outlined above, Stantec was reluctant to assist FDMX in addressing and correcting Stantec's errors, and even indicated that it would not do so without additional compensation from FDMX.

45. FDMX has incurred direct costs and expenses resulting from Stantec's errors and omissions, including additional expenditures required to bring the Facilities into minimal compliance with the ISO standards specified and contracted for by FDMX.

## COUNT I – BREACH OF CONTRACT

46. Plaintiff repeats and realleges each of the allegations contained in Paragraphs 1 through 45 above as if fully set forth herein.

47. The Contract is valid and enforceable.

48. FDMX performed all of its obligations under the Contract.

49. Under the Contract, Stantec agreed to render professional services to FDMX for each phase of the Project, including the formulation of schematic designs, the refinement of these designs into formal Contract Documents, and the supervision and administration of the construction phase.

50. Under Section 2.2 of the Contract, Stantec agreed to perform all of the foregoing services with "professional skill and care," which New Hampshire law interprets to mean the "standards and recommended practices and procedures" of the profession at large, and not as limited to any geographic area or locality. New Hampshire RSA § 508:13.

51. As a result of Stantec's numerous errors and omissions outlined above, Stantec failed to perform its contractual obligations with professional skill and care, breaching the Contract.

52. As a result of Stantec's breaches of the Contract, plaintiff has been damaged in an amount to be proven at trial plus interest and costs, including attorney's fees.

## COUNT II – CONTRACTUAL INDEMNIFICATION

53. Plaintiff repeats and realleges each of the allegations contained in Paragraphs 1 through 45 above as if fully set forth herein.

54. Under Section 12.1 of the Contract, Stantec agreed to indemnify FDMX, its parent and affiliates from and against, *inter alia*, "all losses, claims, liabilities, injuries, damages and expenses, including reasonable attorneys' fees" arising out of or resulting from Stantec's "negligent errors, omissions or negligent acts . . . and any breach by [Stantec] of any term of this Agreement."

55. As a result of Stantec's numerous errors and omissions in the design, supervision and implementation of the Project, FDMX incurred losses, damages and expenses, including additional expenditures required to bring the Facilities into minimal compliance with the ISO standards specified and contracted for by FDMX, plus attorneys' fees and other costs.

56. Despite plaintiff's demands therefor, defendant has failed and refused to indemnify and hold plaintiff harmless from and against these losses, damages and expenses, thereby breaching its indemnification obligations under the Contract.

57. As a result of defendant's breach of the Contract's indemnification provision, plaintiff has been damaged in an amount to be proven at trial, plus interest and costs, including attorneys' fees.

## COUNT III – PROFESSIONAL NEGLIGENCE

58. Plaintiff repeats and realleges each of the allegations contained in Paragraphs 1 through 45 above as if fully set forth herein.

59. Stantec, as a professional architectural and engineering firm, was required to perform the architectural, engineering and contract administration services for the Project in accordance with the standards and recommended practices and procedures required of, and ordinarily exercised by, professional architects and engineers.

60. At all relevant times, Stantec also held itself out as having special expertise in the design and construction of clean rooms.

61. As set forth above, Stantec was negligent in performing the architectural, engineering and contract administration services for the Project in that it failed to perform these services in accordance with the standards and recommended practices and procedures required of, and ordinarily exercised by, professional architects and engineers.

62. As a direct and proximate result of Stantec's professional negligence, plaintiff has incurred damages, including delays, costs, expenses and additional expenditures required to bring the Facilities into minimal compliance with the ISO standards contracted for by FDMX, plus interest, costs and attorneys' fees.

## JURY DEMAND

FDMX hereby demands a jury trial on all counts.

## **PRAYER FOR RELIEF**

WHEREFORE, plaintiff FDMX requests the following relief:

A. Damages against defendant Stantec in an amount to be proved at trial;

B. Pre-judgment and post-judgment interest;

C. All costs and expenses to which plaintiff is entitled, including reasonable attorneys' fees; and

D. Such other further relief as the Court deems just and proper.

Respectfully submitted,

FUJIFILM Dimatix, Inc.,

By its attorneys,

PRIMMER PIPER EGGLESTON & CRAMER PC

Dated: July 14, 2015      By: _____
Thomas J. Pappas, Esq. (N.H. Bar No. 4111)
P.O. Box 3600
Manchester, NH 03105-3600
(603) 626-3300
tpappas@primmer.com

# Merrimack County Sheriff's Office

SHERIFF SCOTT E. HILLIARD
333 Daniel Webster Hwy
Boscawen, NH 03303
Phone: 603-796-6600

STANTEC CONSULTING SERVICES INC
14 CENTRE ST
CONCORD, NH 03301

AFFIDAVIT OF SERVICE

MERRIMACK, SS                                               7/30/15

I, DEPUTY BRUCE A CLOUGH, on this date at __1135__ a.m./p.m., summoned the within named defendant STANTEC CONSULTING SERVICES INC as within commanded, by leaving at the office of Registered Agent Corporation Service Company, d/b/a Lawyers Incorporating Service, 14 Centre Street, Concord, said County and State of New Hampshire, its true and lawful agent for service of process under and by virtue of Chapter 293-A New Hampshire RSA, as amended, a true and attested copy of this Summons and Complaint.

FEES

    Service    $25.00
    Postage      1.00
    Travel      15.00

TOTAL         $41.00

DEPUTY BRUCE A CLOUGH
Merrimack County Sheriff's Office

A TRUE COPY ATTEST:

Mark J. Loomis, Deputy Sheriff